IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs September 5, 2012

## DONNELL LEVON ROBINSON, JR. v. STATE OF TENNESSEE

**Appeal from the Circuit Court for Hardeman County**
**No. CC-10-CR-90     J. Weber McCraw, Judge**

_____

**No. W2012-00329-CCA-R3-PC  - Filed February 5, 2013**

_____

The Petitioner, Donnell Levon Robinson, Jr., appeals the denial of post-conviction relief, arguing that he received ineffective assistance of counsel and that his plea was involuntarily and unknowingly entered.  Upon review, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which THOMAS T. WOODALL and JEFFREY S. BIVINS, JJ., joined.

Terry D. Dycus, Somerville, Tennessee, for the Defendant-Appellant, Donnell Levon Robinson, Jr.

Robert E. Cooper, Jr., Attorney General and Reporter; David H. Findley, Senior Counsel; D. Michael Dunavant, District Attorney General; and Joe L. VanDyke, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

A Hardeman County Grand Jury indicted the Petitioner for first degree premeditated murder.  The Petitioner subsequently entered a plea, pursuant to North Carolina v. Alford, 400 U.S. 25 (1970), to second degree murder in exchange for a sentence of twenty years at one hundred percent release eligibility.

**Plea Submission Hearing.**  At the plea submission hearing, the State summarized the facts supporting the Petitioner's Alford plea:

Had the matter gone to trial, Judge, the State would have introduced proof that on or about the 20th of December of 2009, there was an incident at what was then called D & D. It's a club that's on Highway 64 here in Hardeman County just east of Bolivar.

That on that evening, the defendant in this matter and Mr. Sacarro (spelled phonetically) Bills, the victim, got into a discussion that turned into a disagreement, possibly an argument. That subsequently the defendant shot Sacarro Bills multiple times and after shooting him, beat him with the pistol upon his face, ultimately causing the death of Mr. Bills there in the parking lot at the D & D here in Hardeman County.

Although the Petitioner stipulated that there was a factual basis for his plea, he asserted that he was "being fired upon" during the incident and that he believed "he was about to be killed" by the victim and two other men. The Petitioner stated that he was entering the plea because it was in his best interest to avoid a potential life sentence at trial.

During the plea submission hearing, the trial court informed the Petitioner that he was charged with first degree premeditated murder and that if convicted of that offense, he would be required to serve a life sentence in prison. The court also informed the Petitioner that he was entering an Alford plea to second degree murder, which had a sentencing range of fifteen to twenty-five years at one hundred percent release eligibility. The court said that pursuant to the parties' plea agreement the Petitioner would receive a sentence of twenty years at one hundred percent release eligibility. The court told the Petitioner of the rights he was waiving by entering the Alford plea. During the plea colloquy, the Petitioner stated that he had been able to fully discuss his case with trial counsel and that trial counsel had properly investigated his case and had properly represented his legal interests. The Petitioner said that he had no concerns or complaints about trial counsel and that he was freely and voluntarily pleading guilty. The Petitioner then entered his plea pursuant to Alford. The trial court again stated that the Petitioner's sentence was twenty years at one hundred percent release eligibility. When the trial court asked the Petitioner if he had any other questions, the Petitioner responded, "No."

**Post-Conviction Hearing.** On April 5, 2011, the Petitioner filed a timely pro se petition for post-conviction relief. Following the appointment of counsel, the Petitioner filed an amended post-conviction petition on May 6, 2011. At the December 9, 2011 post-conviction hearing, several exhibits were admitted, including the firearms report, trial counsel's notes regarding the Petitioner's case, and the transcript from the plea submission hearing.

At the post-conviction hearing, the Petitioner testified that although the firearms report in his case was issued approximately five weeks prior to trial, trial counsel never showed him a copy of it. He also stated that trial counsel never showed him any documents related to his case. The Petitioner said that the firearms report showed there were two unrecovered firearms that fired nine millimeter bullets.

The Petitioner claimed that the only thing trial counsel showed him was a list of the State's witnesses. He asserted that trial counsel never showed him any of the witness statements, including his own, because they were Jencks material.[1]

The Petitioner said that he first met trial counsel in December 2009 when his family retained trial counsel. He said the next time he met with trial counsel was at his preliminary hearing in April 2010. At first, he was satisfied with trial counsel's representation of him because trial counsel had done a good job cross-examining some of the State's witnesses at the preliminary hearing and because trial counsel had told him that he had been talking to witnesses in his case. The Petitioner said that he later learned that trial counsel had not talked to any witnesses.

The Petitioner stated that he gave trial counsel a list of witnesses and told him that Lee Chatman, Delirous Walton, and Bradley McNeil were also witnesses. According to the Petitioner, McNeil made the victim and his friends leave the club and saw them return approximately thirty minutes later, which was shortly before the victim was shot. Trial counsel told the Petitioner that he was representing McNeil on unrelated federal charges and that he would talk to him about the Petitioner's case. Trial counsel later told the Petitioner that although McNeil observed the victim and his associates leave and then return, it was not in McNeil's best interest to testify because of his pending federal charges.

The Petitioner said that when his family had trouble paying trial counsel additional funds for his defense, trial counsel began trying to obtain a plea offer from the State. A short time later, trial counsel told the Petitioner that the State had offered him fifteen years at thirty percent, which the Petitioner refused.

The Petitioner stated that although he sent trial counsel a letter containing ten or eleven motions that he wanted him to file, trial counsel only filed a motion for discovery. Although the Petitioner initially believed that trial counsel had issued subpoenas for

---

[1] See Jencks v. United States, 353 U.S. 657, 672 (1957) (holding that a defendant has the right to inspect prior statements or reports by government witnesses following direct examination for the defendant's use in cross-examination).

witnesses in his trial, he later discovered that no subpoenas had been issued. The Petitioner also stated that he received no letters from trial counsel during his case.

The Petitioner stated that he recalled meeting with trial counsel only five times prior to the date of his trial. He said that the weekend prior to trial, trial counsel was trying to convince him to accept the offer of twenty years from the State and met with him for approximately one hour or less on Saturday and Sunday. On Sunday, trial counsel talked with the Petitioner's mother and the mother of the Petitioner's child in order to try to persuade them to convince the Petitioner to accept the State's offer.

The Petitioner said that when going over his plea agreement, trial counsel informed him that he was charged with first degree premeditated murder, which carried a sentence of life without parole. He later learned that his case was merely a life sentence case because the State had never filed a notice asserting that his case was a life without parole case prior to his trial date. The Petitioner described the circumstances surrounding his plea agreement:

> Well, before I signed the plea agreement, I looked on the judgment sheet under offender status. It ha[d] me marked a standard offender and then under the release eligibility, it had me marked violent, 100 percent. So when I seen that, I told [trial counsel]–this was the day of my trial–I told [trial counsel] that I'm not signing the plea bargain because it said violent, 100 percent. So what he did was, he took his ink pen–he told me that the D.A. made a mistake. He took his ink pen and put an "X" in the standard 30 percent [box] and then he put his initials beside it where he changed that and then where it says "life without parole[,"] that box wasn't marked so he put his initials right there to make me believe that my case was life without parole and then he wrote that I wasn't pleading guilty, he said I would be taking an [Alford] plea which means I'm not saying I'm innocent, I'm not saying I'm guilty, it's just in my best interest at this time to take a plea bargain.

The Petitioner stated that trial counsel later changed the release eligibility back to one hundred percent without informing him and used "white-out" to cover the checked box for thirty percent release eligibility.

The Petitioner said he agreed to enter a plea for a sentence of twenty years at one hundred percent release eligibility because trial counsel told him that he would not actually serve one hundred percent of his sentence, that he would serve only thirty percent, because he was a Range I, standard offender. He also stated that trial counsel "nudge[d]" his leg with his elbow below the table during the plea submission hearing when he did not immediately respond to the trial court's questioning. The Petitioner stated that he agreed to enter his plea

because he felt as if he did not have a choice because he had been unable to see any of the evidence against him. Trial counsel also told him that he was going to ensure that his sentence was corrected at the prison so that he would be given thirty percent release eligibility. The Petitioner said he told the court that trial counsel had fully investigated his case because he believed trial counsel's claims about what he said he had done. The Petitioner also explained why he told the trial court at the plea submission hearing that he had no questions or concerns about trial counsel:

> At that time I didn't have any concerns or complaints [about trial counsel] because I took his word and his advice but then . . . when I got to prison I started going to the legal library and trying to see what I could do to get my motion [for] discovery since [trial counsel] said that [the assistant district attorney] wouldn't give it to him and from the advice that I got from the legal aides in the prison, they told me that by law [the assistant district attorney] had to give me my discovery, that [trial counsel] just kept it from me because he didn't get the money he wanted. And that's when I found out that [trial counsel] didn't subpoena no witnesses in my favor, so as far as I know he didn't question no witnesses either.

The Petitioner claimed that the transcript from the plea submission hearing noted the times that he conferred with trial counsel. He claimed that during these noted times he was asking trial counsel whether he was actually going to serve twenty years at thirty percent release eligibility, even though the trial court kept saying twenty years at one hundred percent release eligibility. When trial counsel told him that he would only have to serve twenty years at thirty percent, the Petitioner said he entered his plea. The Petitioner also said that if he had been allowed to see the discovery information, he would have proceeded to trial and would not have entered his plea.

On cross-examination, the Petitioner acknowledged that he understood the statements determined to be Jencks material would have to be provided to the defense at trial. He also acknowledged that he was able to call trial counsel from prison "a couple of times." The Petitioner said he gave a police investigator a list of individuals who were at the club the night of the shooting. This list included the following names: Karekus, Trell Horse, Rod, and South. He admitted that at the time he gave this list to police, he claimed that he was not involved in the victim's shooting. The Petitioner said he gave this same list of names to trial counsel and told trial counsel that Delirous Walton, Lee Chatman, and Bradley McNeil were also witnesses. The Petitioner said he later discovered that trial counsel had not filed any motions and had not subpoenaed any witnesses, which made him feel as if trial counsel had no intentions of defending him. The Petitioner admitted that he did not know when the

judgment form had been completed or if it had been completed for an earlier offer from the State.

Barbara Robinson, the Petitioner's mother, testified that the weekend prior to the first day of trial, her son called her and said that the State had offered him twenty years at thirty percent release eligibility. During this conversation, trial counsel told her that she needed to convince the Petitioner to accept this offer because it was the last offer he would receive before trial and because he would be facing a life sentence at trial. She said she received two or three more phone calls from trial counsel, who was trying to get her help in convincing the Petitioner to take the State's offer. She said that the State had made a previous offer to her son of fifteen years at thirty percent release eligibility, which he refused.

On cross-examination, Ms. Robinson acknowledged that trial counsel had talked to her about the Petitioner's case and about the potential witnesses in the case. She admitted that she was not present for all of trial counsel's meetings with her son prior to the entry of his plea.

Chatashia Williams, the mother of the Petitioner's child, testified that trial counsel called her the day before trial and informed her that the Petitioner had received an offer from the State for twenty years at thirty percent release eligibility. She said trial counsel told her that if the Petitioner refused this offer he would have to serve a life sentence. Williams stated that based on this information, she convinced the Petitioner to accept this offer.

Delirous Walton testified that he was working as a security guard at the club the night of the victim's shooting. He said that he observed the victim and the Petitioner having a "verbal altercation" and then saw the victim pull out a weapon and fire one shot at the Petitioner. On cross-examination, he admitted that he never told the police about his observations. He said that the only person he talked to about his observations was the Petitioner's post-conviction counsel approximately six weeks before the post-conviction hearing.

Lee Chatman testified that he was the Petitioner's friend and one of trial counsel's clients in an unrelated shooting, for which he was still incarcerated. He said he informed trial counsel that he was an eyewitness to the shooting in this case on two different occasions; however, he said trial counsel did not want to talk to him about his observations. Chatman said that he had found three individuals carrying weapons and sent them out of the club the night the victim was shot. He also said he searched the victim when he first tried to enter the club, and the victim was carrying a revolver, so he told him to leave. Chatman stated that the victim returned approximately thirty to forty-five minutes later but stayed outside the club.

-6-

Chatman said he told trial counsel that some of the people on the witness list were not at the club the night of the shooting. He stated that the person who fired the first shot was standing by the road because the shot came through the door to the club where he was standing. He said that although the victim and the Petitioner were standing outside the door, the Petitioner could not have fired the first shot because he was standing with his back to the door of the club. Chatman heard other shots fired but could not tell where they were fired. He said that when he walked outside the club, the victim was lying on the ground between two vehicles and had a chrome pistol near his leg. He said that some individuals were talking to the injured victim and that he did not see the Petitioner. Approximately five minutes later, Chatman saw gunshots coming from a car near the road. He said the incident was "like a shootout." Chatman said he never saw the Petitioner returning gunfire because he was not around when he walked out of the club. When Chatman tried to tell trial counsel this information, trial counsel said, "We'll get to it later," and then moved on to another topic.

On cross-examination, Chatman admitted that he had prior convictions for aggravated burglary and aggravated assault and was on probation for these convictions at the time of the victim's shooting. He also admitted he was currently imprisoned for aggravated assault. He said that he never mentioned anything to the Petitioner about what he had observed while they were both in jail because they were on "different sides of the jail."

Trial counsel testified that he had been practicing law for twenty-two years and that he had handled dozens of first degree murder cases. Trial counsel believed based upon previous plea negotiations with the State, that the Petitioner's case was going to be a life sentence without parole case before the State clarified that it was a life sentence case at the plea submission hearing.

Trial counsel said that the victim was shot on December 20, 2009. On December 21, 2009, after being contacted by the Petitioner's mother, trial counsel took pictures, made a video recording, and took measurements of the crime scene. Trial counsel said he informed the Petitioner that he had gathered this evidence. On December 24, 2009, trial counsel met with the Petitioner for the first time. Trial counsel said that he had notes from that first meeting with the Petitioner, along with notes from every single interview with every witness. He also said he had notes from his interviews with officers, notes from his discussions with the State, and notes from his discussions with the Petitioner's mother. Trial counsel said that his notes showed he met with the Petitioner on December 24, 2009, January 18, 2010, February 16, 2010, and May 2010. He said that the Petitioner's preliminary hearing took place some time between his February and May notes. Trial counsel said that although he had been initially paid only $400.00, he continued to represent the Petitioner through the preliminary hearing even though he had not received any more of his fee. After the preliminary hearing, trial counsel received another $1200.00 towards his fee. Although he

initially quoted a $25,000.00 fee to handle the case, he dropped his fee to $15,000.00 because the Petitioner's mother said that she could not afford the higher fee. Trial counsel said that he initially had an investigator working on the Petitioner's case but that he began doing his own investigation out of his pocket because of the lack of funds. He stated that although he was never paid the fee he quoted, he never stopped working on the Petitioner's case.

Trial counsel said that the Petitioner initially claimed that he did not have anything to do with the killing. After trial counsel talked to some witnesses who contradicted the Petitioner's claim, the Petitioner changed his story.

Trial counsel stated that the Petitioner's claim that he had not talked to witnesses in his case was untrue. He said that he not only followed up on the witnesses that the Petitioner gave him but he found some of his own witnesses that he discussed with the Petitioner. The Petitioner told him that an individual named South would verify that the crime was not a premeditated killing. However, shortly before the trial, South told trial counsel that he was uncomfortable testifying and that the Petitioner had changed his clothes after shooting the victim. South also said that the Petitioner was enraged at the time of the incident because the Petitioner hit the victim in the face with the butt of his gun after shooting him. Prior to this conversation with South, trial counsel said he had been encouraging the Petitioner to go to trial because he felt he "was ahead of the police in terms of the investigation" and believed that he had information that the State did not have.

Trial counsel stated that the Petitioner gave him a list of four witnesses, which included Karekus Hendrix, Trell Horse, Rod, and South. He said the Petitioner wrote this list of witnesses on his legal paper at the jail on January 18, 2010, and gave it to him. Trial counsel said this list was never given to the police. He said that although he and the Petitioner discussed other possible witnesses, these additional witnesses were discovered by trial counsel. Trial counsel said he talked to Karekus Hendrix on February 16, March 24, and June 3. When trial counsel talked to Hendrix on June 3, he asked him if he knew how to contact the other witnesses on the list. In addition, Hendrix gave him Bradley McNeil's name. Trial counsel talked to McNeil on May 16, and May 19. Trial counsel said that he represented McNeil on unrelated federal charges at the same time he was representing the Petitioner but that there was no conflict of interest because McNeil was not testifying against the Petitioner and was not going to testify as a witness for the defense. McNeil told trial counsel that the party at the club on December 20, 2009, was a fund-raiser for his sister who had been shot during some gang-related violence. Trial counsel said McNeil and Hendrix told him that some out-of-town members of the Gangster Disciples gang appeared at the club during the fund-raiser to ensure that there was no trouble. Trial counsel said he learned from his own investigation that the victim and the victim's brother were members of the Vice

Lords gang. On June 4, South returned to trial counsel's office and reiterated that he did not want to testify in the Petitioner's case .

Trial counsel stated that the Petitioner never mentioned Lee Chatman as a possible witness in his case. Although Chatman claimed he talked to trial counsel about the Petitioner's case, trial counsel said he had no notes in the Petitioner's file and no electronic notations on his computer regarding Lee Chatman as a possible witness in the Petitioner's case. Trial counsel also said that the Petitioner never gave him the name of Delirous Walton as a possible witness.

Trial counsel confirmed that the State refused to provide the witness statements to him ahead of trial because they were Jencks material. He also confirmed that he asked for one continuance because he had not received the firearms report from the State, which the trial court denied.

Trial counsel's defense theory was that the victim was standing between two groups that were shooting at each other with 9 millimeter guns and no one knew who fired the shot that killed the victim. He said he was hopeful that he could convince the jury to convict on a lesser included offense or that he could get a hung jury. However, when the firearms report showed that all of the bullets in the victim's body had come from the same gun, trial counsel said that his defense theory that the victim was caught in crossfire was not viable.

Trial counsel stated that initially the State had a weak case against the Petitioner because they did not have much evidence. Later, the State found a witness who claimed that the Petitioner had threatened to kill the victim when the victim got out of jail. This witness testified against the Petitioner at the preliminary hearing. The victim's brother also testified at the preliminary hearing that he and his group fired their guns after seeing the victim shot. After the preliminary hearing, trial counsel felt that the State's case against the Petitioner was stronger and that it was too risky to proceed to trial. In addition, he said that once the defense's witnesses started "caving," he felt that the Petitioner had a good chance of being convicted of first degree murder.

Trial counsel acknowledged receiving a letter from the Petitioner in April regarding his claim that trial counsel was not properly communicating with him. Trial counsel said that at that time, he had not seen the Petitioner in two months, although he had been communicating with the Petitioner's family about the fact that he needed more money in order to continue working on the Petitioner's case. When he received the letter, trial counsel said that he had received partial discovery and some gruesome crime scene photographs of the victim's injuries from the State. Although his investigation of the crime scene showed

that there were more shots going from the Petitioner than at him, trial counsel was still planning on arguing that the Petitioner was defending himself when he shot the victim.

Trial counsel stated that he met with the Petitioner briefly the Friday before trial. He also met with the Petitioner three times on Saturday. At the first meeting on Saturday, they talked about trial preparation. Trial counsel then called the Petitioner's mother and talked to the Petitioner again. The Petitioner spoke with his mother, who encouraged him to enter a plea. The Petitioner then spoke to South, who also encouraged him to enter a plea. Then trial counsel returned a third time to confirm that the Petitioner was ready to enter a plea before the parties asked the trial court for permission to settle the case. At that point, the Petitioner asked to see his child and said that if he could see his child, he was ready to enter a plea.

Trial counsel stated that he did not complete the plea form or the judgment form and that these forms were completed by the assistant district attorney assigned to the Petitioner's case. Trial counsel stated that the assistant district attorney erroneously marked that the release eligibility was thirty percent and then used "white-out" on the thirty percent release eligibility and asked trial counsel to initial the change. The assistant district attorney then marked the box for one hundred percent release eligibility on the judgment form. Trial counsel acknowledged that he did write "without parole" on the plea agreement because both the State and the defense were initially looking at this case as a life sentence without parole case. However, during the plea colloquy, the assistant district attorney clarified that this case was a merely a life sentence case, and trial counsel questioned the Petitioner throughly to ensure that he understood he was facing a life sentence of fifty-one years at one hundred percent release eligibility.

Trial counsel stated that prior to the preliminary hearing, he had tried to convince the assistant district attorney to agree to a plea to manslaughter, but he refused. Later, approximately forty-five days prior to trial, trial counsel talked to the assistant district attorney about a plea to manslaughter with an out-of-range sentence of fifteen years with a thirty percent release eligibility, but the State refused and offered twenty years. Trial counsel communicated the offer of twenty years to the Petitioner, who refused it. Shortly thereafter, the assistant district attorney informed trial counsel that the offer of twenty years was to second degree murder, which meant that it had a release eligibility of one hundred percent. At that point, trial counsel said, "Oh, I didn't understand that." He said that the difference in release eligibility did not matter at that point because the Petitioner had already rejected the offer of twenty years.

Trial counsel stated that the "third communication of a proposed offer" was the Saturday before trial. When asked if he explained to the Petitioner prior to his plea that the

-10-

offer was for twenty years at one hundred percent release eligibility, trial counsel stated, "In all honesty, now, I don't remember that discussion that Saturday. What I remember was talking about the amount of time and I remember talking to [the Petitioner] and I told his mama that I was very concerned that he might end up getting [a] life [sentence at trial]." He said, "I knew some things that I couldn't share with his mother that I had been told by witnesses[, and] I knew that if [these witnesses] were put under any degree of pressure they were going to fold." Trial counsel stated that he did not have any notes from the meeting with the Petitioner on Saturday because he did not have his file with him. He said he visited the Petitioner on Saturday because he wanted to tell him what he had discovered about the defense witnesses and wanted to discuss his "heavy concerns" about trying the case. He noted that he and the Petitioner had been talking about trial strategy prior to that time. However, at that point, South had already told trial counsel that his initial statement to him was not the truth and trial counsel was not going to allow South to present perjured testimony at trial.

Trial counsel stated that he was not trying to mislead the Petitioner into thinking that he was facing a life sentence without parole because at that time he sincerely believed that the Petitioner was facing a life sentence without parole. As he got closer to the plea, he corrected his misconception with the Petitioner. He also said that the trial court made it clear to the Petitioner that he was facing only a life sentence during the plea colloquy. Regarding the Petitioner's claim that trial counsel was privately telling him that the twenty-year sentence would be served at thirty percent during the plea, trial counsel said that he and the Petitioner were sitting "within four feet" of the trial court in the jury room of the old courthouse. He also stated that "there was just nothing to hide" because he and the Petitioner were sitting across the table from the trial court and were "within earshot of each other."

Trial counsel said that during the plea colloquy, the trial court made it clear to the Petitioner that the sentence range for second degree murder was fifteen to twenty-five years with a one hundred percent release eligibility. Then the court stated that the Petitioner was entering an Alford plea to twenty years at one hundred percent release eligibility. The trial court again informed the Petitioner that his sentence was twenty years at one hundred percent prior to the end of the plea submission hearing.

Trial counsel said he never told the Petitioner that the trial court was wrong about the one hundred percent release eligibility and that his sentence would actually be twenty years at thirty percent. He said that the Petitioner was "twisting" what he said to him because he did inform the Petitioner that the prison could reduce a sentence for good behavior credits. He stated, "I told him in the jail that they still take off–you can get up to 20 percent taken off of that sentence–and that is true, by the way–at the direction of the Tennessee Department

of Correction[]." Trial counsel denied telling the Petitioner that if there was something wrong with his sentence he could call the Department of Correction and have his time reduced. He said that the record from the plea submission hearing "reflect[ed] that there was no misunderstanding" that the Petitioner's sentence was twenty years at one hundred percent.

On cross-examination, trial counsel admitted that he did not issue any subpoenas in the Petitioner's case. However, he explained that he rarely issued subpoenas because he did not want to notify the State of his potential witnesses. Trial counsel also admitted that he did not remember discussing release eligibility percentages with the Petitioner. He acknowledged that he did not file a motion in limine regarding the gruesome photographs of the victim prior to trial but asserted that he could have made an oral motion in limine regarding the photographs during trial. Trial counsel said that he did not file any motions other than the discovery motion because he did not believe that other motions were necessary. He admitted that he did not file a motion for exculpatory evidence to avoid the Jencks issue with the witness statements. However, he stated that at the preliminary hearing he had gotten the victim's brother to admit that he had fired his gun, which was exculpatory. Trial counsel stated that he did not believe that Chatman's testimony at the post-conviction hearing was truthful and that Chatman likely would not have survived cross-examination because he never told the police what he saw, because he had a significant criminal record, and because he fled the scene following the shooting. Trial counsel asserted that he had met with the Petitioner more than five times.

The assistant district attorney who was assigned to the Petitioner's case also testified. He stated that the Petitioner had been charged with first degree premeditated murder because he left the club to retrieve a weapon and because he had previously made a statement that he was going to kill the victim when the victim got out of jail. In addition, the assistant district attorney stated that the number of shots to the victim and the beating of the victim following the shooting indicated premeditation.

The assistant district attorney stated that approximately a month prior to trial, he offered the defense twenty years to settle the case. He said trial counsel discussed this offer with the Petitioner and informed the assistant district attorney that the Petitioner was willing to accept the offer of twenty years at thirty percent release eligibility. The assistant district attorney immediately reminded trial counsel that the plea was to second degree murder, which had a one hundred percent release eligibility. He said that trial counsel had a look on his face that said, "How could I have made this mistake?" Trial counsel then returned to tell the Petitioner that the offer was actually for twenty years at one hundred percent release eligibility. A few minutes later, the Petitioner rejected the offer of twenty years at one hundred percent.

He stated that a few days prior to trial, trial counsel called him and said that he believed the Petitioner was ready to accept the State's offer, if the court was willing to take the plea since it was after the plea deadline. The assistant district attorney stated that he prepared the plea form, which showed twenty years at one hundred percent. In addition, he said that the plea agreement, the trial court's explanation of the sentence, and the judgment form all showed that the sentence was twenty years at one hundred percent release eligibility. He acknowledged that the State had not filed a notice for a life without parole sentence. He also acknowledged that the release eligibility box for thirty percent had been checked, and later corrected with "white-out," and that correction was initialed by trial counsel. The assistant district attorney confirmed that he completed the judgment form, and trial counsel initialed in a couple of different places on it. He also stated that someone, probably trial counsel, had written on the judgment form that the Petitioner was receiving a twenty-year sentence in exchange for entering an Alford plea.

On cross-examination, the assistant district attorney stated that he believed that he was responsible for correcting the erroneous release eligibility percentage with "white-out," especially because he "rechecked the violent 100 percent box." He was unable to state when the erroneous release eligibility percentage had been corrected prior to the plea. The assistant district attorney said he was never concerned that trial counsel was not ready to try the Petitioner's case during their plea discussions just before trial.

On January 11, 2012, the post-conviction court filed its order denying relief. Following entry of this order, the Petitioner filed a timely notice of appeal.

**ANALYSIS**

On appeal, the Petitioner argues that the post-conviction court erred in determining that trial counsel provided effective assistance of counsel and that his plea was knowingly and voluntarily entered. Post-conviction relief is only warranted when a petitioner establishes that his or her conviction is void or voidable because of an abridgement of a constitutional right. T.C.A. § 40-30-103 (2006). The Tennessee Supreme Court has held:

> A post-conviction court's findings of fact are conclusive on appeal unless the evidence preponderates otherwise. When reviewing factual issues, the appellate court will not re-weigh or re-evaluate the evidence; moreover, factual questions involving the credibility of witnesses or the weight of their testimony are matters for the trial court to resolve. The appellate court's review of a legal issue, or of a mixed question of law or fact such as a claim of ineffective assistance of counsel, is de novo with no presumption of correctness.

-13-

Vaughn v. State, 202 S.W.3d 106, 115 (Tenn. 2006) (internal quotation and citations omitted). "The petitioner bears the burden of proving factual allegations in the petition for post-conviction relief by clear and convincing evidence." Id. (citing T.C.A. § 40-30-110(f); Wiley v. State, 183 S.W.3d 317, 325 (Tenn. 2006)). Evidence is considered clear and convincing when there is no serious or substantial doubt about the accuracy of the conclusions drawn from it. Hicks v. State, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998) (citing Hodges v. S.C. Toof & Co., 833 S.W.2d 896, 901 n.3 (Tenn. 1992)).

**Ineffective Assistance of Counsel.** The Petitioner contends that trial counsel provided ineffective assistance of counsel by telling him that he would serve his sentence at thirty percent release eligibility rather than one hundred percent release eligibility, by failing to investigate and prepare his case, and by failing to discover and present Delirous Walton, Lee Chatman, and Bradley McNeil at trial. The State responds that the record supports the trial court's denial of post-conviction relief. We agree with the State.

Vaughn also repeated well-settled principles applicable to claims of ineffective assistance of counsel:

> The right of a person accused of a crime to representation by counsel is guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 9, of the Tennessee Constitution. Both the United States Supreme Court and this Court have recognized that this right to representation encompasses the right to reasonably effective assistance, that is, within the range of competence demanded of attorneys in criminal cases.

202 S.W.3d at 116 (internal quotations and citations omitted).

In order to prevail on an ineffective assistance of counsel claim, the petitioner must establish that (1) his lawyer's performance was deficient and (2) the deficient performance prejudiced the defense. Id. (citing Strickland v. Washington, 466 U.S. 668, 687 (1984); Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975)). "[A] failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim. Indeed, a court need not address the components in any particular order or even address both if the [petitioner] makes an insufficient showing of one component." Goad v. State, 938 S.W.2d 363, 370 (Tenn. 1996) (citing Strickland, 466 U.S. at 697).

A petitioner successfully demonstrates deficient performance when the clear and convincing evidence proves that his attorney's conduct fell below "an objective standard of reasonableness under prevailing professional norms." Id. at 369 (citing Strickland, 466 U.S.

-14-

at 688; Baxter, 523 S.W.2d at 936). Prejudice arising therefrom is demonstrated once the petitioner establishes "'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" Id. at 370 (quoting Strickland, 466 U.S. at 694). In order to satisfy the "prejudice" requirement in the context of a guilty plea, a petitioner "must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." Hill v. Lockhart, 474 U.S. 52, 59 (1985); see Serrano v. State, 133 S.W.3d 599, 605 (Tenn. 2004).

We note that "[i]n evaluating an attorney's performance, a reviewing court must be highly deferential and should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." State v. Burns, 6 S.W.3d 453, 462 (Tenn. 1999) (citing Strickland, 466 U.S. at 689). Moreover, "[n]o particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant." Strickland, 466 U.S. at 688-89.

First, the Petitioner contends that trial counsel provided ineffective assistance by telling him that he would serve his sentence at thirty percent release eligibility rather than at one hundred percent release eligibility. At the post-conviction hearing, the Petitioner testified that trial counsel "tricked" him into entering his plea by telling him that although his sentence was twenty years at one hundred percent release eligibility, he would only be required to serve thirty percent of the sentence because he was a standard offender. Although trial counsel said that he did not remember talking to the Petitioner about the release eligibility percentage of his sentence prior to entry of the plea, he said the record from the plea submission hearing "reflect[ed] that there was no misunderstanding" that the Petitioner's sentence was twenty years at one hundred percent. In addition, the assistant district attorney stated that he believed that he was responsible for correcting the erroneous release eligibility percentage with "white-out," especially because he "rechecked the violent 100 percent box." He also stated that he was never concerned that trial counsel was not ready to try the Petitioner's case during their plea discussions. The post-conviction court found that the testimony of Barbara Robinson and Chatashia Williams, who both testified that trial counsel told them that the sentence would be served at thirty percent, was credible. Although the court acknowledged that there was "some confusion about the potential sentence regarding the charges," it found that trial counsel "resolved those issues with the [Petitioner] before the Court took [the Petitioner's] plea." The post-conviction court added, "All in all, the Court accredits the testimony of [trial counsel]." We agree with the post-conviction court's determination that trial counsel properly informed the Petitioner of his sentence. The

Petitioner has failed to establish that trial counsel's performance was deficient or prejudicial regarding this issue.

Second, the Petitioner contends that trial counsel provided ineffective assistance in failing to investigate and prepare his case. Specifically, he argues that counsel should have filed a motion in limine regarding the victim photographs, a motion for exculpatory evidence, a motion for funds to hire an investigator, and a motion for continuance after receiving firearms report shortly before trial. He also argues that trial counsel should have met with him more than five times in preparing his case. At the post-conviction hearing, the Petitioner testified that trial counsel never showed him any of the witness statements or the evidence against him, never talked to or subpoenaed any witnesses, never filed any motions other than a motion for discovery, and only met with him five times. Trial counsel testified that he did not file any motions other than a motion for discovery because he did not feel that any other motions were necessary. In addition, trial counsel stated that he asked for a continuance when he received the firearms report a few weeks before trial, which the trial court denied. Although he acknowledged that he did not file a motion in limine regarding the victim photographs, he stated that he could have made an oral motion at trial to exclude these photographs. Trial counsel stated that he met with the Petitioner more than five times. Regarding this issue, the post-conviction court found that trial counsel "adequately investigated the case, counseled his client and represented his interests." The court also determined that trial counsel "successfully fought a First Degree Murder charge." We agree with the post-conviction court's finding that trial counsel adequately investigated and prepared the Petitioner's case. The Petitioner has failed to establish that trial counsel's performance was deficient or prejudicial regarding this issue.

Third, the Petitioner contends that trial counsel provided ineffective assistance of counsel in failing to discover and present Delirous Walton, Lee Chatman, and Bradley McNeil at trial. We note that although the Petitioner presented testimony from Walton and Chatman at the post-conviction hearing, he did not present testimony from McNeil. This court has concluded that "[w]hen a petitioner contends that trial counsel failed to discover, interview, or present witnesses in support of his defense, these witnesses should be presented by the petitioner at the evidentiary hearing." Black v. State, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). The presentation of the witness at the post-conviction hearing is the only way for the petitioner to establish:

(a) a material witness existed and the witness could have been discovered but for counsel's neglect in his investigation of the case, (b) a known witness was not interviewed, (c) the failure to discover or interview a witness inured to his prejudice, or (d) the failure to have a known witness present or call the witness

-16-

to the stand resulted in the denial of critical evidence which inured to the prejudice of the petitioner.

Id. Consequently, we agree with the post-conviction court's finding that trial counsel did not err by failing to discover or present McNeil at trial.

At the post-conviction hearing, the Petitioner testified that he gave trial counsel a list that included the following names: Karekus, Trell Horse, Rod, and South. He also testified that he told trial counsel that Chatman, Walton, and McNeil were potential witnesses. Walton testified that he observed the victim and the Petitioner having a "verbal altercation" and then saw the victim pull out a weapon and fire one shot at the Petitioner. However, on cross-examination, Walton admitted that he never told the police about what he saw and that the only person he talked to about his observations was the Petitioner's post-conviction counsel approximately six weeks before the post-conviction hearing. Chatman testified that he told trial counsel that he was an eyewitness to the shooting in this case on two different occasions but that trial counsel was not interested. Chatman said he told the victim, who was carrying a revolver to leave the party, but the victim returned approximately thirty to forty-five minutes later and stayed outside the club. He also said that the Petitioner could not have fired the first shot because the Petitioner was standing with his back to the door of the club when the first shot was fired into the club. The post-conviction court found that Walton was not credible. Although the trial court did not specifically make a credibility determination about Chatman, the court did determine that trial counsel did not provide ineffective assistance regarding this witness. We agree with the post-conviction court's determination that trial counsel was not ineffective in failing to discover or present McNeil, Walton, or Chatman at trial. The Petitioner has failed to establish that trial counsel's performance was deficient or prejudicial regarding this issue.

**Alford Plea.** The Petitioner also argues that his plea was not knowing or voluntary because he was not informed of the evidence against him and was not told that his sentence was twenty years at one hundred percent release eligibility. When analyzing the validity of a guilty plea, we follow the federal landmark case of Boykin v. Alabama, 395 U.S. 238 (1969), and the Tennessee landmark case of State v. Mackey, 553 S.W.2d 337 (Tenn. 1977), superseded on other grounds by rule as stated in State v. Wilson, 31 S.W.3d 189, 193 (Tenn. 2000). State v. Pettus, 986 S.W.2d 540, 542 (Tenn. 1999). In Boykin, the United States Supreme Court held that a trial court may not accept a guilty plea unless there is an affirmative showing that the guilty plea was "intelligent and voluntary." 395 U.S. at 242. When accepting a guilty plea, the trial court is responsible for "canvassing the matter with the accused to make sure he has a full understanding of what the plea connotes and of its consequence." Id. at 244. In Mackey, the Tennessee Supreme Court held that "the record of acceptance of a defendant's plea of guilty must affirmatively demonstrate that his decision

was both voluntary and knowledgeable, i.e., that he has been made aware of the significant consequences of such a plea; otherwise, it will not amount to an 'intentional abandonment of a known right.'" 553 S.W.2d at 340.

The Tennessee Supreme Court has emphasized that a plea is not voluntary if it is the result of "'[i]gnorance, incomprehension, coercion, terror, inducements, [or] subtle or blatant threats . . . .'" Blankenship v. State, 858 S.W.2d 897, 904 (Tenn. 1993) (quoting Boykin, 395 U.S. at 242-43). A trial court must look at a number of circumstantial factors before determining whether a guilty plea is voluntary and intelligently made. Id. These factors include "the relative intelligence of the defendant; the degree of his familiarity with criminal proceedings; whether he was represented by competent counsel and had the opportunity to confer with counsel about the options available to him; the extent of advice from counsel and the court concerning the charges against him; and the reasons for his decision to plead guilty, including a desire to avoid a greater penalty that might result from a jury trial." Id. (citing Caudill v. Jago, 747 F.2d 1046, 1052 (6th Cir. 1984)).

The transcript of the plea submission hearing is included in the appellate record. The plea colloquy shows that the trial court fully advised the Petitioner of his rights and clearly outlined, more than once, that the Petitioner was receiving a sentence of twenty years at one hundred percent release eligibility in exchange for his Alford plea to second degree murder. During the plea colloquy, the Petitioner said he had been able to fully discuss his case with trial counsel and that trial counsel had properly investigated his case and had properly represented his legal interests. He also said that he had no concerns or complaints about trial counsel and that he was freely and voluntarily entering his Alford plea to twenty years at one hundred percent. Moreover, the post-conviction court determined that trial counsel "adequately investigated the case, counseled his client[,] and represented his interests." It also determined that trial counsel "met with petitioner and discussed the case, including possible sentences." The post-conviction court found that the Petitioner "actually understood the significance and consequences of the particular decision" to enter an Alford plea and that "the decision was not coerced." The court specifically discredited the Petitioner's testimony that he was coerced into entering his plea by trial counsel's kicks and bumps under the table during the plea hearing. The court also determined that the Petitioner "was informed at the plea hearing of the sentence that he would receive and any doubts as to sentencing were fully explained by counsel and the Court." Finally, the court, while acknowledging that "some issues could have been presented better by [trial counsel], found that the Petitioner "was thoroughly advised of the consequences of the plea both by [trial counsel] and the Court" and that "[a]ny ambiguities regarding the . . . sentence were corrected or clearly stated during the plea hearing." We agree with the post-conviction court's finding that the Petitioner knowingly, intelligently, and voluntarily entered his Alford plea. The Petitioner is not entitled to relief.

## CONCLUSION

We conclude that the Petitioner failed to prove by clear and convincing evidence that counsel provided ineffective assistance or that his Alford plea was involuntary. Accordingly, we affirm the judgment of the post-conviction court.

_____
CAMILLE R. McMULLEN, JUDGE